UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PETRO RENTALS, INC.,
BRENDAN GRILLO,
DREW SAVINO

**COMPLAINT**

*Plaintiffs*,

**Civil Action No.** 5:25-cv-41 (DNH/ML)

-against-

**JURY TRIAL DEMANDED**

THE CITY OF AUBURN, NEW YORK,
CODE ENFORCEMENT OFFICER BRIAN HICKS,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY, UNIDENTIFIED EMPLOYEES AND
AGENTS OF THE CITY OF AUBURN, IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITIES.

*Defendant*.

Plaintiffs Brendan Grillo, Drew Savino, and Petro Rentals, Inc., (collectively "Plaintiffs") by and through its attorneys, The Glennon Law Firm, P.C., brings this complaint against Defendants and alleges as follows:

## NATURE OF THE ACTION

1.      This action arises out of the abusive and disparate treatment of Plaintiffs by various Code Enforcement Officers and other municipal employees in the City of Auburn against Plaintiffs, who own and rent several residential properties in the City. Specifically, the officers, employees and City wielded allegations of bogus code enforcement violations and other tactics as a weapon to harass Plaintiffs and damage them both personally and in their business and caused significant economic and non-economic losses.

## THE PARTIES

2.      Plaintiff Brendan Grillo is a natural person residing in Cayuga County in the State of New York and co-owner and President of Petro Rentals, Inc. ("Petro").

3.      Plaintiff Drew Savino is a natural person residing in Cayuga County in the State of New York and co-owner of Petro Rentals, Inc.

4.      Plaintiff Petro is a domestic business corporation registered with the New York State Department of State at the address P.O. Box 1557, Auburn, New York, United States, 13021.

5.      Defendant the City of Auburn, New York, is a municipality located in Cayuga County, New York.

6.      Defendant Brian Hicks is an unelected county official charged with upholding the Auburn City Code.

7.      Upon information and belief, Brian Hicks is the Senior Code Enforcement Officer for the City of Auburn.

8.      Defendant "UNIDENTIFIED EMPLOYEES AND AGENTS OF THE CITY OF AUBURN", are heretofore yet unknown persons who have knowledge and information that is pertinent to the issues at bar or directly participated in the violation of Plaintiffs' rights.

## JURISDICTION

9.      This Court has original jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, as this action arises under the Constitution, laws, or treaties of the United States; in particular, this matter arises under 42 U.S.C. § 1983 ("Section 1983").

10.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction to hear and decide claims arising under state and/or common law.

11.     All causes of action herein have been commenced within the limitation period as set forth in N.Y. C.P.L.R. §§ 208, 214 and 214-g or are otherwise timely.

## VENUE

12.    Venue is proper in the United States District Court for the Northern District of New York under § 28 U.S.C. 1391 as all the events, acts, and omissions giving rise to the claims occurred in Auburn, Cayuga County, New York; and, additionally, because the Plaintiffs' principal place of business and residences are in Cayuga County, New York.

## NOTICE OF CLAIM

13.    On January 18, 2024, Plaintiffs served and filed written Notice of Claim with the Auburn City Clerk's Office.

14.    Over 30 days have elapsed since the serving of this Notice and that matter has not been settled or otherwise disposed of.

## FACTS

15.    Plaintiffs are the owners of over forty (40) properties in Cayuga County, New York, and are in the business of renting units to both commercial and residential tenants.

16.    This business puts Plaintiffs in regular contact with both the City of Auburn, New York and employees of the city's Code Enforcement Office and various other municipal offices.

17.    Over the last decade, Petro has acquired additional properties to rent to tenants in Cayuga County, New York.

18.    Plaintiffs have previously filed three (3) Article 78 Petitions in New York State Supreme Court against the City of Auburn, New York due to the irreparable harm

suffered by Plaintiff, in part due to the city's unconstitutional code violation fee structures.

19.     In July 2024, the City of Auburn settled with Plaintiffs and pledged to alter their unconstitutional fee structure, among other concessions.[1]

20.     However, the City of Auburn continues to assess Plaintiffs unconstitutional fines in contravention of the stated terms of the settlement, causing harm to their business.

21.     Additionally, the City of Auburn continues to fail to provide Plaintiffs a coherent summary of code violations and an appropriate administrative appeals process for addressing purported housing code violations and/or fines, again, in contravention of the stated terms of the settlement, causing harm to their business.

22.     The City of Auburn also continues to act in a manner that is violative of Plaintiffs' due process rights, despite that they settled an Article 78 Petition addressing the same behavior.

23.     On or about August or September of 2024, Plaintiffs received a flurry of notices that code violations had been cleared following their settlement of the three Article 78 cases against the City of Auburn.

24.     But the confusion and lack of clarity surrounding the remaining citations continues.

25.     The City of Auburn City Code requires that all code violations be sent by certified mail.

26.     Defendants systematically fail to comply with this requirement.

---

[1] See Cauyga County Supreme Court Index Nos. E2023-0221, E2023-0758 and E2023-0959.

27.     Rather than certified mail, Plaintiffs receive notifications from the City of Auburn of code violations by email, if at all.

28.     The City of Auburn has, at various times during the past decade, engaged in actions, including but not limited to the issuance of bogus code violations, specifically intended to undermine Plaintiffs' successful ownership of these properties and the continued operation of its business.

29.     Six (6) properties owned by Plaintiffs serve as examples of the harassment and unethical actions of the City of Auburn's Code Enforcement Office which are specifically and exclusively targeting Plaintiffs.

30.     The violations of Plaintiffs' protected, constitutional rights are not limited to these properties.

31.     Plaintiffs' other properties have also been subjected to the same bogus code enforcement violations and other harassing and targeted behavior at the hands of the City of Auburn and its various employees.

**24 Wood Street**

32.     24 Wood Street, Auburn, New York, 13021 is a single-family rental home that was acquired by Petro in September of 2015 and has been operated continuously as a rental property since that time.

33.     From May 2019 through July 2024, the City of Auburn has asserted that Petro was found in violation of the City of Auburn's Municipal Code Chapters on twenty-five (25) occasions.

34.     In one example, during the spring of 2024, a storm caused a tree limb to fall onto the neighboring parcel to 24 Wood Street.

35. The neighbor had been in touch with Petro by phone prior to May 2024 and demanded that Petro remove the tree limb.

36. Petro employees requested that the neighbor be in touch with her homeowner's insurance company and submit a claim for any damage.

37. Upon information and belief, the neighbor then reached out to the city.

38. In approximately May of 2024, Petro received an email from the City of Auburn indicating that a tree limb from a tree on the property of 24 Wood Street fell on a neighbor's house.

39. In response, Petro supplied the City with confirmation that they were not liable for damage, if any, to the neighbor's property and again suggested that she call her homeowner's insurance company.

40. The City of Auburn then began to threaten legal action against Petro unless it paid to remove the tree completely from the property.

41. Assistant Corporation counsel Tim Brennan was determined to pursue the requirement that Petro remove the tree, and specifically stated to Petro's attorney, Justin Huffman, that the City would take Petro to court over the issue.

42. One hour after this conversation, Petro received a notice for its appearance in Court the very next day.

43. Counsel for both parties discussed the case further that evening and it had become clear that the City's legal position was not tenable.

44. The next day, two hours before the scheduled appearance, the City of Auburn revoked their complaint.

6

45.    This prosecution was malicious and pursued in bad faith, exclusively with an intent to harm Plaintiffs in their business.

46.    The City of Auburn then sent an employee of the fire department and another City employee, who represented themselves as a "tree expert" and upon information and belief was an arborist," to 24 Wood Street and declared the remaining portions of the same tree "unhealthy" and instructed Petro to take down the tree.

47.    No credentials for these individuals were ever provided to Plaintiffs, nor was their involvement explained to Plaintiffs.

48.    In response, Plaintiffs retained the services of an arborist to evaluate the tree's structural integrity.  The arborist opined it was a perfectly healthy tree and it did not need to be removed, and this opinion was conveyed to the City of Auburn.

49.    In addition to the damages flowing from having to defend against the aggressive, bogus prosecution of this violation, Plaintiffs also sustained damages because its insurance premiums increased because of this bogus code violation.

50.    After months and months of harassing conduct towards Petro, the City of Auburn finally agreed with Plaintiffs' assertion that the tree limb's coming down was an act of God and the tree itself did not need to be removed.

51.    The City of Auburn changed the classification from a code violation to a "neighbor dispute", but the damage had already been done.

52.    Eventually, the neighbor removed the tree limb from their property.

53.    Upon information and belief, the City of Auburn may have assisted in this process.

54.    Defendant Brian Hicks, a Senior Code Enforcement Officer employed by the City of Auburn's Code Enforcement Office has repeatedly visited the property located at 24 Wood Street, uninvited and unexpectedly.

55.    Defendant Hicks entered the home without notice or invitation and proceeded to question a Petro employee for approximately ten (10) minutes on various issues related to the home.

56.    Following this improper visit, Plaintiffs received an additional complaint regarding the property at 24 Wood Street on August 6, 2024, from the Code Enforcement Office.

57.    Defendant Hicks made a second uninvited, unannounced visit to the property on or around August 27, 2024 and walked into the house without permission.

58.    At all times, the City of Auburn has acted in a hostile and vengeful demeanor towards Plaintiffs in their interactions regarding 24 Wood Street, and has consistently treated Plaintiffs differently than other landlords or rental companies in the City of Auburn.

59.    The City has continuously sought different ways to negatively impact Plaintiffs in their business, including filing bogus code violations that they are aware have no legal basis, and pursuing them up until the moment a third party (like a Judge, in this example) might rightly dismiss them.

60.    Since this incident, the neighbor has refused Plaintiffs use of a shared driveway between the properties, necessitating a driveway improvement and causing additional damages.

**53 Parker Street**

61.     53 Parker Street, Auburn, New York, 13021 is a single-family rental home that was acquired by Petro Rentals in September of 2015 and has been operated regularly as a rental property since that time.

62.     From November 2015 through October 2019, Petro was alleged to have been in violation of the City of Auburn's Municipal Code Chapters on fourteen (14) occasions.

63.     In or around late 2019, Plaintiffs had proceeded with an eviction action against a former tenant of 53 Parker Street.

64.     In April of 2020, the City of Auburn registered 53 Parker in its vacant building registry.

65.     The City of Auburn will take this action against Plaintiffs' properties, even where the vacancy is simply the tenant turn-over period.

66.     When the City of Auburn places Plaintiffs' property on the vacant building registry, they will also add a fee to the taxes associated with that property, irrespective of the length of time of the vacancy.

67.     On or about May 5, 2021, Plaintiffs obtained building permits to begin construction work on 53 Parker to prepare the home for new ownership.

68.     The house was empty between the eviction in late 2019 and the date that Plaintiffs "pulled" permits.

69.     Despite that there were no residents living in the building, there was electricity flowing to the building, to facilitate the remodeling work, which necessarily require electricity.

9

70.    Work began in earnest between May 5, 2021 and June 27, 2022, and there continued to be no tenants in the home in light of the renovation project.

71.    The work included demolition and various home remodeling projects including but not limited to a new kitchen, new plumbing throughout the home, new dry wall, new windows and a new roof.

72.    In January of 2022 Plaintiffs paid for a new roof, new siding and new windows for the home, and construction began on installing both.

73.    On June 27, 2022, New York State Gas & Electric ("NYSEG"), the electrical utility provider to the home, shut off power to the home on the instruction of the City of Auburn.

74.    Plaintiffs became aware of the shut off when workers on the project reported that the home did not have power to its outlets anymore, sometime after the actual shut off.

75.    Plaintiffs could not obtain an answer from the City of Auburn regarding why the power had been shut off to 53 Parker.

76.    On or about October 21, 2022, Plaintiffs sent a request directly to NYSEG to restore power to the property.

77.    On November 29, 2022, Plaintiffs received a voicemail from NYSEG indicating that the City of Auburn had contacted NYSEG to notify them that the property was condemned, and as a result NYSEG cannot turn the power back on because service is not permitted there.

78.    In the voicemail message NYSEG instructed Plaintiffs to call the Code Enforcement Office with any additional questions.

79.    On December 8, 2022, Plaintiffs also learned from a voicemail from NYSEG that the gas to the property had been turned off, and that a job would need to be created to turn it back on, and that process was not immediate.

80.    On December 9, 2022, Plaintiffs' attorney, Justin Huffman, reached out to Nate Garland, Corporation Counsel to the City of Auburn to discuss the utilities running to 53 Parker.

81.    Mr. Huffman shared the voicemail from NYSEG with Corporation Counsel.

82.    Corporation Counsel indicated to Mr. Huffman that the City of Auburn was empowered to condemn any building and to freely share the list of condemnations with NYSEG.

83.    However, Corporation Counsel confirmed during that phone call that Code Enforcement was not empowered to call NYSEG to shut power off.

84.    December 16, 2022, NYSEG temporarily turned on the electric to permit a pressure test to be conducted, which is a precursor test to permitting NYSEG gas to flow to the property.

85.    Where there is an open permit for a building remodel and an active process of remodeling happening on a parcel, that building should not be condemned under the relevant codes for the City of Auburn.

86.    The City of Auburn Code Enforcement Office has shown a pattern of repeatedly harassing Plaintiffs over the property located at 53 Parker Street, to the point that Plaintiffs have lost two years of revenue due to the inability to rent this home to a tenant.

87.     Plaintiffs have now completed all exterior work, rough in plumbing, rough in electric, and hanging of sheet rock.

88.     However, the negative financial impact of having a vacant building, including needing to re-do some of the remodeling work due to utilities shut offs caused by the City of Auburn, has been significant for Plaintiffs.

89.     Had the City not ordered the shut-off of power to 53 Parker the work would be complete at this time and the unit would be generating revenue.

90.     The City has filed bogus code violations against Plaintiffs one hundred and eighty (180) times, not including several other Municipal Code violations alleged against Plaintiffs regarding 53 Parker Street.

91.     A property near to 53 Parker has recently completed the process of being renovated and then named a historical landmark.

92.     Corporation Counsel Nate Garland has made multiple remarks to Plaintiffs and their employees about selling the property to the City of Auburn.

93.     The City of Auburn would benefit from obtaining the 53 Parker parcel to create additional parking for the landmark.

94.     Upon information and belief, the City of Auburn has been using its authority regarding control over utilities to the property to encourage Plaintiffs to sell the 53 Parker Street property to the City.

95.     Further, the City of Auburn has directed NYSEG to shut off power to 53 Parker Street for over two years, once again increasing Plaintiffs' financial hardship and inability to maintain a tenant at this property.

96.     The City of Auburn and its employees have engaged in a campaign of targeted harassment towards Plaintiffs in a manner wholly distinct from the City's dealings with all other landowners in the City of Auburn.

**15 Jefferson Street**

97.     15 Jefferson Street, Auburn, New York, 13021 is a multi-family rental home that was acquired by Petro Rentals in September 2015 has been operated continuously as a rental property since that time.

98.     At the time of purchase, there were code violations associated with the building that pre-dated Plaintiffs' ownership.

99.     Defendant Hicks decides, on a case by case basis, whether the new owner or the old owner is liable for the violations.

100.    Of course, when it comes to Plaintiffs, Defendant Hicks decided that Petro was liable.

101.    It was understood between Plaintiffs and the City of Auburn that Plaintiffs would be assuming responsibility for these properties, and that in taking over these distressed properties, Plaintiffs' desire was to develop them into livable spaces and to have a successful working relationship with the City of Auburn.

102.    Plaintiffs coordinated with the City of Auburn and various employees including Jennifer Haines, regarding grants and other funding avenues to rehabilitate properties, including 15 Jefferson Street.

103.    None of those conversations ever resulted in any grant funding, and as a result Petro self-funded all repair work on 15 Jefferson and other properties like it.

104.    The historical violations associated with the home that pre-dated Plaintiffs' ownership were not overly difficult to address, and some renovation work to the home specifically tailored to address the violations should have resolved any outstanding violations.

105.    Plaintiffs' desire was to begin working to address the violations immediately upon transfer of the property.

106.    After purchasing the property, Plaintiffs began to address the immediate health and safety concerns presented in the code violations.

107.    Despite these violations, several tenants did not desire to leave their rentals, and Plaintiffs needed to proceed through a process to evict the tenants to begin work on 15 Jefferson.

108.    In approximately December of 2016, Plaintiffs obtained permits to address a kitchen remodel, plumbing, and windows.

109.    Code enforcement officers from the City of Auburn would come to the property regularly to monitor the work being done on the home.

110.    Plaintiffs and their employees consistently made themselves available to their inspectors to demonstrate the work that was being completed.

111.    The City of Auburn regularly arrived late at or failed to attend their noticed inspections of the property.

112.    Plaintiffs regularly engaged their attorney, Mr. Huffman, to be present at the scheduled appointments to lend a sense of order to the process.

113.    Despite this, code officers would still miss appointments.

114.    This wasted significant company resources in the process of ensuring that employees were available, and tasks were completed again and again despite the City employees "no showing" appointments.

115.    Plaintiffs' employees would call the City of Auburn to reschedule their inspection appointments so that the renovation work could continue.

116.    The City of Auburn employees made it clear to Plaintiffs' employees that they were bothered by the process of having to reschedule appointments that the code officers failed to attend.

117.    Plaintiffs worked diligently to ensure that each code violation was addressed but had no way of knowing from the City of Auburn whether they had succeeded in addressing violations.

118.    This is because even when a violation had been fully addressed to the City of Auburn's full satisfaction, the violation was not removed from the list of violations associated with a property.

119.    Despite specifically requesting a list showing the pending violations with respect to 15 Jefferson, the City of Auburn never presented Plaintiffs with such a list.

120.    In addition, Plaintiffs would continue to receive violation notices for issues that had already been fully corrected.

121.    When they did attend a scheduled meeting, the City of Auburn code officers would typically perform an inspection and present a list of citations at a later, unspecified date.

122.    Plaintiffs would then complete the work to address each of those citations.

15

123. The code officer would return, and then present Plaintiffs with a new list that still contained all the old citations and included additional items.

124. This process made it extremely difficult for Plaintiffs to keep a clear running list of what was required to gain a certificate of occupancy and or a clear citation list.

125. There was also often insufficient time to address the code violations that the Code Officers identified.

126. To take one example, if a home were to receive a paving violation in January, that violation physically cannot be corrected until March due to the outdoor temperature.

127. Despite this, the paving violation continues to accrue fees until it is corrected, despite the owner's literal inability to correct it.

128. This created an atmosphere of chaos with respect to this property, where it was unclear what the City of Auburn wanted Plaintiffs to do, when and whether City employees were going to come check that it had been done, and was symptomatic of how the City of Auburn treated each one of Plaintiffs' properties.

129. Defendant Hicks harnessed this chaos to intentionally create the illusion that Petro "bit off more than they could chew" with their home rehabilitation projects, and continually moved the goalpost of completion to further the narrative that Petro was not accomplishing anything with respect to 15 Jefferson and other parcels.

130. Eventually, in 2021, the City of Auburn filed a petition against Plaintiffs with respect to 15 Jefferson because there were "too many violations."

131.    Ironically, no one in the City could identify which violations had already been fully addressed and which ones had not.

132.    Plaintiffs had to pay their attorney to fight the City's bogus petition in housing court and was damaged as a result.

133.    Plaintiffs were dragged to court once a month for years because the City of Auburn could not provide a clear answer on what violations were pending and which had been addressed.

134.    By way of example, the City of Auburn continually cited Plaintiffs for paint issues with respect to 15 Jefferson.

135.    Plaintiffs elected to paint the entire house.

136.    The City of Auburn would not withdraw their paint citation despite the fact that every inch of the house had been freshly painted.

137.    From December 2014 through January 2022, the City entered thirty-five (35) separate, bogus code violations against Petro with respect to 15 Jefferson.

138.    These violations have resulted in Petro paying thousands of dollars to the City of Auburn to lift bogus code violation citations.

**25 Thorton Avenue**

139.    25 Thorton Avenue, Auburn, New York, 13021 is a single-family rental home that was acquired by Petro Rentals on September 1, 2015.

140.    In approximately late November or early December of 2023, cleaning staff were at 25 Thorton preparing to welcome a new tenant into the space.

141.    While the cleaning staff was readying the home, an employee noticed a spark from the stove and immediately called the fire department.

17

142. The fire department arrived, along with Code Enforcement officers.

143. The City of Auburn cited Plaintiffs for having a stove spark, and then also told them to repair the foundation and replace the water heater in the home.

144. No inspection was scheduled, and Code Enforcement officers had no reason to proceed through the entire home and perform an inspection.

145. The City of Auburn also elected to condemn the property but failed to notify Plaintiffs of the condemnation

146. As such, the new tenants moved in on December 4, 2023.

147. Plaintiffs addressed the issues the next day and provided proof of the same to the City of Auburn Code Enforcement Office.

148. The City of Auburn indicated that because the new water heater was not installed by a City of Auburn-certified master plumber, the code violation was not cleared.

149. Plaintiffs are unaware of this alleged requirement ever being applied to any other property management company in the City of Auburn.

150. Plaintiffs immediately sought a quote from a master plumber to remove and reinstall the hot water heater and they quoted Petro approximately $6,000.00.

151. Plaintiffs were unwilling to pay $6,000.00 for work that had already been correctly completed, in order to have a person who has a certification bestowed upon them by the City of Auburn do the work.

152. Upon information and belief, no one in the Code Enforcement Office has the master-plumber certification from the City of Auburn.

153.    The certification is not a state-wide requirement and has been invented by the City of Auburn to drive business to specific plumbers and limit competition.

154.    The City of Auburn will often condemn properties with no notice to Plaintiffs, rendering tenants homeless, and then refuse to work with Plaintiffs to correct any bogus issue they have identified.

155.    Plaintiffs were finally notified in a letter that the City of Auburn had condemned this property because the water heater was not replaced with a permit from a "licensed plumber approved in the City of Auburn."

156.    This property remains condemned by the City of Auburn, and Plaintiffs' tenants were informed power would be shut off at this location, simply due to the City's demand that Plaintiffs' plumber obtain particular licensure.

157.    Upon information and belief, Plaintiffs would be required to spend nearly an additional $4,000.00 to hire a "master" plumber, rather than allowing internal staff members to handle basic plumbing projects.

158.    The threat to turn off power supply to an occupied home is incongruent with the unevenly applied objective of making only Petro Rental obtain a licensed master plumber to complete all plumbing work at all Petro properties.

159.    Following Plaintiffs' victory with respect to their Article 78 Petitions, the City of Auburn removed the condemnation and dropped the issue of City of Auburn licensing for plumbers to do work at the home on 25 Thorton.

**110 Janet Street**

160. 110 Janet Street, Auburn, New York, 13021 is a multi-family rental home that was acquired by Petro Rentals on September 1, 2015 and has been operated continuously as a rental property since that time.

161. From September 2015 to February 2023, Plaintiffs were found in violation of the City of Auburn's Municipal Code Chapters on forty-three (43) occasions.

162. In just six years, Plaintiffs have been billed over $9,000.00 in Municipal Code violation fines from the City's Code Enforcement Office, exacerbating Plaintiff's loss of revenue.

163. In just one month, Plaintiffs were fined $6,875.00 by the City for a variety of code enforcement allegations.

164. As with 15 Jefferson, 110 Janet Street had a significant number of code violations at purchase, and Mr. Huffman again had to represent Plaintiffs in housing court on a monthly basis to clear those violations which were no longer at issue.

165. The bogus code violations, once again, were not properly tracked or cancelled upon resolution.

166. Defendant Hicks would come to the property and simply write all over his list of supposed code violations in an unintelligible manner that brought Plaintiffs no closer to being able to bring the property into compliance.

167. There was no standardized process for noting the "clearing" a code violation.

168. Plaintiffs spent approximately $135,000.00 on the property to bring the building to code including by putting on new siding, windows, doors, and a new roof.

169.    Once again, the City of Auburn demanded that all plumbing work be completed by a master-plumber specifically licensed by the City of Auburn.

170.    Plaintiffs again called to obtain quotes, and the associated costs were astronomical compared to a standard plumber or the cost of Petro employees, who are trained to do so, addressing the plumbing issue.

171.    Despite this, to move the project forward and pacify the City of Auburn, Plaintiffs hired a plumber with the alleged, requisite qualifications.

172.    To remove any doubt, Plaintiffs removed all the plumbing work that had been done, including fixtures, pipes, and the like, and had the licensed plumber start from the beginning.

173.    Upon completion, the City of Auburn plumbing inspector came to the property to inspect the work, but it became clear during the inspection that he did not hold the certification that the plumber was required to hold.

174.    On another occasion, the plumbing inspector approached a vehicle parked at 110 Janet and demanded to know what an electrician was doing there, simply because he was parked near the home.

## **PLUMBING ISSUES**

175.    As outlined above, the City of Auburn has targeted Plaintiffs for enforcement of alleged regulations regarding who can do plumbing work inside the city.

176.    This targeting has been unevenly applied, seemingly exclusively applied to Plaintiffs, but not applied to other landlords in the City.

21

177. The City of Auburn and the Code Enforcement Office are using the master plumber requirement as a sword rather than a shield, to force Plaintiffs to spend more money than their competitors to complete the same projects.

178. The City of Auburn and the Code Enforcement Office are being guided by a "Plumbing Board" that has an inherent conflict of interest with respect to the issue of master plumber licensure.

179. The Plumbing Board is composed of plumbers who wish to keep the number of people qualified to do plumbing work inside the City of Auburn as small as possible to increase their revenue.

180. The "master plumber" qualification is not worth the paper that it is written on.

181. The person who administers the master plumber examination is not a master plumber.

182. There is no governmental interest inherent in creating an independent structure for plumbing certification separate and apart from the structures that are already in place at the New York State level.

183. On one occasion, a toilet was removed from the basement of one of Plaintiffs' rental properties and placed in driveway the home's driveway for Plaintiffs' employees to haul away.

184. The City of Auburn cited Plaintiffs for engaging the services of a plumber who was not a certified master plumber, despite that no plumbing work had actually occurred on the property at that time.

185. The City of Auburn's aggressive and relentless enforcement of a certification scheme that exists exclusively to defraud homeowners has caused Plaintiffs economic damages.

**<u>Corning Federal Credit Union</u>**

186. Further exacerbating Plaintiffs' financial hardship at the hand of the City is the City's decision to interfere with Plaintiffs' private business relationships with Corning Federal Credit Union and other lenders which has resulted in Plaintiffs' loss of mortgage notes and financing.

187. Beginning in approximately 2015 Plaintiffs' various mortgages for the properties that it owned were transferred to Corning Federal Credit Union (hereinafter "Corning").

188. Those mortgages were then consolidated into a single loan in the amount of $3.5 million from Corning.

189. Plaintiffs established themselves as reliable debtors of Corning's, always paying its monthly payment obligation on time and otherwise comporting to the various terms of the controlling lending agreements between itself and Corning.

190. In March, September and November of 2023, Plaintiffs filed three separate Article 78 Petitions against the City of Auburn alleging, among other things, that the City's fee structure for Code Violations was unconstitutional.

191. These Petitions also sought to reverse the various unconstitutional fees that the City of Auburn assessed against Plaintiffs.

192. Plaintiffs were advised by the City of Auburn that they could not pay their property taxes until their various unconstitutionally levied fees had been paid.

193. Because Plaintiffs were not going to pay the unconstitutional fees, in part because they had filed a lawsuit seeking to have the fees reversed, they were barred by the City of Auburn from paying their property taxes.

194. In a meeting with former corporation counsel, John Rossi, Plaintiffs' attorney had been advised by Mr. Rossi that if Plaintiffs paid the fines and then paid the taxes they would not ever be able to recover the fines, even if they were eventually deemed unconstitutional.

195. Plaintiffs elected to follow the advice of then-corporation counsel, and attempt to negotiate the ability to just pay their taxes, leaving the fines for another day.

196. The City of Auburn then directly contacted Plaintiffs' lender, Corning, to ensure that Corning would no longer lend to Plaintiffs, and their business would suffer extreme economic hardship and actual damages.

197. The City of Auburn contacted Corning by letter on February 17, 2023.

198. In contacting Corning, the City of Auburn was intentionally seeking to extinguish the relationship between Corning and Petro and harm Plaintiffs' business.

199. Corning and Plaintiffs were actively working to address the tax issue.

200. On one occasion in the spring of 2023, Plaintiffs' and Mr. Huffman were meeting with Corning Bank employees to address the mortgages, and Nate Garland happened to call Mr. Huffman at the same time as the meeting.

201. Mr. Huffman asked if Mr. Garland was comfortable being put on speaker in front of everyone present at the meeting and he agreed.

202. Mr. Huffman went around the room and made it clear to Mr. Garland who was present at the meeting.

24

203.    Mr. Garland stated on the phone that day that the City of Auburn did not consider Plaintiffs delinquent or absentee taxpayers or owners.

204.    Rather, he indicated that: "this is how laws are changed based on your lawsuit."

205.    The group discussed what steps could be taken to address any concerns from the bank and to City of Auburn.

206.    Mr. Garland then drafted a stipulated resolution of the issue, and Mr. Huffman provided it to the bank, who willingly executed it and returned it to Mr. Garland.

207.    Corning waited for over a month for the City of Auburn to counter-sign the statement, but the City never took any action at all.

208.    Corning finally indicated, after a month of waiting for the City to act, that they had no choice but to move forward with calling the loans.

209.    Corning specifically required resolution with respect to the fines and fees stemming from the various bogus code violations to continue to lend to Plaintiffs.

210.    From Corning's perspective, the City of Auburn's response time to their inquiries was too slow, and the City refused to provide a concrete plan for how to address the issue of unpaid fees while litigation was pending.

211.    Corning attempted various approaches with the City to resolve the issue. Specifically, Corning suggested that Plaintiffs pay the face value of their taxes with none of the interest, penalties, fees during the same call with Mr. Garland.

212.    Mr. Garland indicated he would follow up on that question, but never did so.

25

213. By approximately mid-May 2023, Corning became unwilling to lend to Plaintiffs, and Plaintiffs were required to seek mortgages for their properties elsewhere.

214. Despite repeated assurances from Plaintiffs that they were not intentionally failing to pay their tax obligations, and rather that the City of Auburn was making a discretionary administrative decision that rendered Plaintiffs unable to pay their taxes, Corning still accelerated the loans.

215. Plaintiffs then attempted to do business with Generations Bank and transfer the loans to them.

216. Generation had already entered into a business relationship with Plaintiffs, providing a loan of approximately $600,000.00.

217. Plaintiffs were hopeful that despite the problems that the City had caused with Corning, that Generations Bank might be a reasonable alternative.

218. During the application process, Generations reached out to the City of Auburn to discuss the properties and following that conversation

219. Upon information and belief, the City of Auburn advised Generations of the fines they had assessed against Plaintiffs and the taxes owing as a result.

220. The City of Auburn was under no obligation to share this information with Generations Bank.

221. Following their conversation with the City of Auburn, Generations Bank denied Plaintiffs' loan application.

222. Plaintiffs were forced to take a mortgage out with a different company at a substantially increased interest rate and other unfavorable terms.

26

223.    The interest rates on Plaintiffs' new mortgages were significantly higher than the rates it has been receiving at Corning, which damaged and continues to damage Plaintiffs financially.

224.    The financial impact of this unnecessary change in lender, brought on exclusively by the intentional and tortious acts of the City of Auburn, caused Plaintiffs to incur damages which exceed Fifty Million Dollars ($50,000,000.00).

**City of Auburn Letters to Plaintiffs' Tenants**

225.    Also on February 17, 2023, the City of Auburn also reached out to each and every one of Plaintiffs' tenants by letter and notified them of the Plaintiffs' alleged tax delinquency.

226.    The City of Auburn sent these letters to harm Plaintiffs' reputation in the Auburn community.

227.    Upon information and belief, the City of Auburn has never sent these types of letters to any of the other landlords' tenants who own property in the City of Auburn, irrespective of their tax payments status.

228.    The City of Auburn specifically targets Plaintiffs for this kind of public embarrassment and harassment, in an effort to harm Plaintiffs in their business.

229.    The letters stated: "[t]he City of Auburn hereby demands that you cure the foregoing default **within ninety (90) days of the date of this letter or by May 18, 2023**, by making a payment in the total amount of [individual payment amounts for each property]…" (emphasis in original).

230.    To be sure, this letter caused mass confusion among Plaintiffs' tenants regarding the appropriate next steps.

27

231.    As a result of these letters going out to all of Plaintiffs' tenants, Plaintiffs were required to field multiple calls regarding administrative concerns raised by the letters.

232.    Some tenants became confused about whether they were required to pay the taxes or face eviction, where to send rent to, and whether rent was still owed to Plaintiffs.

233.    Some tenants also became concerned that they would have to move because they could not pay and called Plaintiffs in a state of panic.

234.    Employees who were fielding these calls also became concerned about their own job security.

235.    In sending these letters to all of Plaintiffs' tenants, the City of Auburn has damaged Plaintiffs' relationships with their tenants and with the Auburn community, and negatively impacted Plaintiffs' ability to conduct their business in Auburn.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
42 U.S.C. § 1983 for Violation of Plaintiffs' Civil Rights

1.    Plaintiffs repeat and reallege all allegations in all preceding paragraphs as though fully set forth herein.

2.    The specific acts, including, but not limited to target harassment, negligent failure to train, hire, supervise, and retain, each form a separate and distinct violation of Plaintiffs' civil rights.

3.    The custom or policy of Defendants, as set forth above, caused Plaintiffs to be subjected to a denial of constitutional rights in direct violation of the provisions of 42 U.S.C. 1983.

4.    The civil rights of Plaintiffs, as guaranteed under the Constitution, statutes,

28

common law, and case law of the United States and New York State were willfully violated by the above-enumerated actions of the Defendants.

5.    Defendants deprived Plaintiffs of their rights, privileges, and immunities pursuant to the First, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 by denying Plaintiff their constitutional rights under the laws of the United States.

6.    With respect to the First Amendment, Plaintiff was subjected to retaliation as a direct and proximate result of exercising their First Amendment right to petition the government through expression of grievance in the form of three Article 78 Petitions.

7.    Upon filing, and even after settlement of the Petitions, the City of Auburn continued to assess Plaintiffs exorbitant fees associated with supposed code violations, and held them to a higher standard of compliance than they held any other rental company in the City.

8.    With respect to the Fifth Amendment, Plaintiff was deprived of property without due process of the law when the goodwill they had built up with their lender and among their tenants was decimated by the City of Auburn's active campaign to thwart their business.

9.    The City of Auburn did not provide adequate process to challenge their assessment of code violations fees, nor did they provide adequate process to challenge or otherwise prevent the City of Auburn from sending letters intentionally designed to decimate the goodwill that Plaintiffs had built up with their lender and others.

10.    With respect to the Fourteenth Amendment, Petro enjoys the same protections as an individual, and was denied those protections through the acts and

29

omissions of the City of Auburn.

11.     Petro is similarly situated to a number of other rental companies across the City of Auburn.

12.     No other rental company has been so deliberately and methodically attacked by the City of Auburn in a manner specifically devised to decimate their business.

13.     As a direct and proximate result of the foregoing, Plaintiffs have suffered and continue to suffer economic damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
*Tortious Interference with Existing Business Relations (alleged against all Defendants)*

14.     Plaintiffs repeat and reallege all allegations in all preceding paragraphs as though fully set forth herein.

15.     Plaintiffs had a business relationship with Corning Federal Credit Union ("CFCU") and Generations Bank.

16.     At all times relevant herein, Defendants knew that Plaintiffs had a business relationship with CFCU and Generations Bank.

17.     A claim for tortious interference is warranted when there is evidence that a defendant purposely caused a party to default on its loan obligations with a third-party. *See Bernberg v Health Management Systems, Inc.*, 303 AD2d 348 (2d Dept, 2003).

18.     As described above, Defendants directly interfered with the business relationships between Plaintiffs and CFCU and Generations Bank.

19.     With regard to the latter, Plaintiffs were actively doing business with CFCU when Defendants contacted CFCU to notify them of the debts the Defendants themselves maliciously caused Plaintiffs to incur.

20.     Similarly, with respect to Generations Bank, Plaintiffs were actively doing business with Generations Bank, but when the Bank contacted the City of Auburn, Defendants notified them of the debts the Defendants themselves maliciously caused Plaintiffs to incur.

21.     Despite CFCU's willingness to work with Plaintiffs and most importantly, the City, to gain assurances that Plaintiffs were not delinquent in their tax payments, the City failed to provide such assurances in writing, even after making them verbally.

22.     As a direct result of the Defendants' malfeasance in assessing the bogus code violations and disdain for Plaintiffs, Defendants hung Plaintiffs out to dry, and did not follow up on any of their promised assurances to CFCU.

23.     Upon information and belief, they also conveyed information to Generations Bank that stymied their lending relationship.

24.     Defendants were aware of the negative impact of their inaction and chose not to act irrespective of the consequences.

25.     Defendants also reached out to Plaintiffs' tenants in writing to notify them of the debt that, again, they had maliciously caused Plaintiffs to incur.

26.     The Defendants interfered out of malice and/or spite and/or pecuniary motives, thereby inflicting intentional harm on Plaintiffs.

27.     The Defendants' interference amounted to extreme and unfair economic pressure or was otherwise wrongful under applicable law.

28.     Defendants' actions and statements qualify as wrongful conduct sufficient to allege a tortious interference with business relations claim.

29.     Plaintiffs had business relationships with many potential clients, lenders and

31

real estate groups, but not limited to CFCU and prospective relations with many others.

30.     As a direct result of the Defendants' conduct, Plaintiffs were dropped by CFCU as a client and forced to seek financing at increased interest rates with all associated fees of changing lenders.

31.     Also as a direct result of the Defendants' conduct, Plaintiffs' loan application with Generation Bank was denied.

32.     Plaintiffs were forced to seek financing at increased interest rates with all associated fees of changing lenders.

33.     These new financial terms were highly detrimental to the finances of their business and caused significant economic damage.

34.     Other lenders and deal partners have run for the hills, making the search for an appropriate lender all the more difficult.

35.     As a direct result of Defendants' interference, Plaintiffs lost existing contractual relationships that would have allowed them to secure a profit significantly above what they are now able to secure as a result of Defendant's malicious actions.

36.     As a direct result of the Defendants' interference, Plaintiffs lost existing economic relationships in leaseholds, lenders and/or equity partners.

37.     As a direct and proximate result of Defendants' tortious interference, Plaintiffs sustained severe economic and non-economic damages.

38.     As a result of Defendants' actions, Plaintiffs have sustained damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
*Tortious Interference with Prospective Business Relations*
*(alleged against all Defendants)*

32

39.    Plaintiffs repeat and reallege all allegations in all preceding paragraphs as though fully set forth herein.

40.    As described above, Defendants directly interfered with the prospective business relationship between Plaintiffs and CFCU, Generations Bank and potential future tenants.

41.    Indeed, Defendants had intentionally and secretly sent targeted communication to CFCU and Plaintiffs' tenants to stymie Plaintiffs' ability to do business going forward.

42.    Upon information and belief, they had also communicated the fact of their bogus fines and impact on Plaintiffs' taxes to Generations Bank.

43.    Defendants' improper dissemination of information to intended to discredit Plaintiffs by casting doubt upon the stability of their business and their risk profile negatively affected all of Plaintiffs' efforts causing a further spiraling effect and significant financial damage.

44.    The Defendants interfered out of malice and/or spite and/or pecuniary motives, thereby inflicting intentional harm on Plaintiffs.

45.    The Defendants' interference amounted to extreme and unfair economic pressure or was otherwise wrongful under applicable law.

46.    As a direct result of the Defendants' conduct, Plaintiffs have incurred astronomic economic damages, including borrowing at rates that greatly exceed their prior rates, a piecemeal approach to their mortgages, and other prospective tenants, lenders and deal partners have running for the hills.

47.    The false and misleading communications from the City were widely

disseminated and directed toward the public including, but not limited to, individuals and entities known to have business relationships with Plaintiffs with the sole intent of impinging upon their contractual relations with Plaintiffs.

48.     Defendants' actions, omissions and statements qualify as wrongful conduct sufficient to allege a tortious interference with business relations claim.

49.     The Defendants' interference amounted to extreme and unfair economic pressure or was otherwise wrongful under applicable law.

50.     As a direct result of Defendants' interference, Plaintiffs lost prospective economic relationships that would have allowed them to secure a profit.

51.     As a direct result of the Defendants' interference, Plaintiffs lost prospective economic relationships in leaseholds, lenders and potential equity partners.

52.     As a direct and proximate result of Defendants' tortious interference, Plaintiffs sustained severe economic and non-economic damages.

### FOURTH CAUSE OF ACTION
*Negligent Failure to Train, Hire, Supervise, and Retain*

53.     Plaintiffs repeat and reallege all allegations in all preceding paragraphs as though fully set forth herein.

54.     Defendants had a duty to conduct appropriate and proper hiring, training, supervision and retention of municipal employees as to the appropriate conduct in documenting and enforcing the codes of the City of Auburn.

55.     Defendants knew or should have known that their employees were actively and maliciously targeting Plaintiffs and causing economic and non-economic damages to Plaintiffs and their business.

56.     Defendants had a duty to prevent risks of harm which were known, or which

34

should have been known, and to prevent their employees from acting in a manner that damaged Plaintiff.

57.    As a direct and proximate result of Defendants' failure to train, hire, supervise and retain municipal employees effectively, they are liable to Plaintiffs for compensatory damages, together with interest and costs.

58.    In the alternative, Defendant City of Auburn was aware of Defendant Hick's misconduct in his official role as a Code Enforcement Officer and continued to permit him to act in that role, which constitutes negligence by a City employee for which Defendant City of Auburn is responsible by virtue of respondeat superior.

59.    At all times material hereto, Defendants City of Auburn, Defendant Brian Hicks, and/or their agents, servants, employees, and/or staff were willful, wanton, malicious, reckless and/or outrageous in their disregard for the constitutional rights of Plaintiff and of the various duties owed to Plaintiff.

### FIFTH CAUSE OF ACTION
*Prima Facie Tort (alleged against all Defendants)*

60.    Plaintiffs repeat and reallege all allegations in all preceding paragraphs as though fully set forth herein.

61.    As set forth above, Defendants intentionally and gratuitously inflicted harm upon Plaintiffs for the sole purpose of causing Plaintiffs harm. Defendants did so for their own reasons—likely sheer personal gratification, or fun—in any case, purely out of malice.

62.    Defendants' foregoing intentional and malicious interference with Plaintiffs' facilities, tenants, investors and lessors by any means—including subterfuge, misrepresentations and manipulation of processes—constitutes conduct that is the very essence of disinterested malevolence.

63.    There is no reasonable, much less lawful, excuse or justification for any of Defendants' actions.

64.    As a direct and proximate result of Defendants' malicious conduct, Plaintiffs have been injured, and will continue to suffer special injury, including lost valuable time, money, opportunities, profit, land rights and the quiet use and enjoyment of their property.

65.    Such special injury to Plaintiffs includes: (a) vast, unnecessary capitalized costs and expenses incurred by Plaintiffs in connection with Corning FCU calling their note and having to scramble for financing due to the Defendants malfeasance; and (b) substantial lost cash flows from their properties as a result of loss of business, tenants, and future business.

66.    In addition, because Defendants' conduct evidences such wanton indifference to their civil and legal obligations as to suggest criminal intentionality and/or recklessness, Plaintiffs are entitled to a further award of punitive damages in an amount to be determined at trial, but in no event less than fifty million dollars ($50,000,000.00).

## DEMAND FOR JURY TRIAL

67.    Plaintiffs hereby demand a jury trial.

**WHEREFORE,** as a result of the conduct and actions of the defendants herein alleged, Plaintiffs demand judgment:

       (1)    Awarding compensatory damages, jointly and severally, in an amount to be proved at trial, but in any event in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction; extent permitted by law;

(2)    Awarding punitive damages to the extent permitted by law;

(3)    Awarding costs and fees of this action, including attorneys' fees to

the extent permitted by law;

(4)    Awarding prejudgment interest to the extent permitted by law;

(5)    Awarding such other and further relief as to this Court may seem

just and proper.

Dated: Rochester, New York
        January 8, 2025

THE GLENNON LAW FIRM, P.C.

*/s/ Ashley R. Westbrook*
Ashley R. Westbrook, Esq.
Peter J. Glennon, Esq.
*Attorneys for Plaintiff*
160 Linden Oaks
Rochester, New York 14625
Telephone: (585) 210-2150
AWestbrook@GlennonLawFirm.com
PGlennon@GlennonLawFirm.com