UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PETRO RENTALS, INC. *et al.*,

        Plaintiffs,

        -v-            5:25-CV-41 (DNH/ML)

THE CITY OF AUBURN,
NEW YORK, *et al.*,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID N. HURD
United States District Judge

## DECISION & ORDER

## I.    INTRODUCTION

On January 8, 2025, plaintiffs Brendan Grillo ("Grillo") and Drew Savino ("Savino"), co-owners of plaintiff Petro Rentals, Inc. ("Petro"), a property leasing company, filed this 42 U.S.C. § 1983 action alleging that defendants City of Auburn (the "City"), Senior City Code Enforcement Officer Brian Hicks ("Officer Hicks"), and Doe employees violated their First, Fifth, and Fourteenth Amendment rights. Dkt. No. 1. After plaintiffs amended their complaint as of right, Dkt. No. 17, defendants moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 22.

The motion has been fully briefed, Dkt. Nos. 25, 30, 33, and will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND

The following facts are taken from plaintiffs' amended complaint, Dkt. No. 17, and will be assumed true for the purpose of assessing defendants' motion to dismiss.

Grillo and Savino live in Cayuga County. Am. Compl. ¶¶ 5–6. They are co-owners of Petro, a domestic corporation headquartered in Auburn, New York. *Id.* ¶ 5–7. Plaintiffs own over forty commercial and residential properties in the City. *Id.* ¶ 19. They are in "regular contact" with City officials, including Officer Hicks. *Id.* ¶ 20.

Over the past decade, plaintiffs have purchased additional properties in the City. *See* Am. Compl. ¶ 21. Some of these properties "were in need of significant repair." *Id.* ¶ 22. Plaintiffs told defendants that they planned to rehabilitate these properties. *Id.* ¶ 23.

Although defendants assured plaintiffs "that they will be a partner in this process, the bogus code violations begin flowing immediately in most cases." Am. Compl. ¶ 24. Plaintiffs have refused to "pay these bloated, bogus fees," which they claim result from defendants' "unconstitutional fee structure." *Id.* ¶ 28. Later, as a result of these unpaid fees, the City would not accept plaintiff's payment of property taxes for certain properties. *Id.* ¶ 29.

Plaintiffs have already filed three Article 78 petitions in Supreme Court, Cayuga County, against the City. Am. Compl. ¶ 30. According to plaintiffs, these Article 78 petitions challenged defendants' "unconstitutional code violation fee structures." *Id.* As plaintiffs explain, this fee structure imposes escalating or compounding fines for uncorrected code violations that are "bogus" or "unconstitutional." *See id.* ¶¶ 32–36, 38.

Plaintiffs have repeatedly requested from defendants a "list of which violations were opened and which ones had been addressed" to defendants' satisfaction. Am. Compl. ¶ 37. Although plaintiffs are not sure how much they owe, they "estimate that they have paid [defendants] in the hundreds of thousands of dollars to resolve bogus fees." *Id.* ¶ 39.

In July of 2024, the City settled with plaintiffs and "pledged to alter their unconstitutional fee structure, among other concessions." Am. Compl. ¶ 41. But plaintiffs allege that defendants continue to assess fees "under the unconstitutional fee structure in contravention of the stated terms of the settlement, causing harm to their business." *Id.* ¶ 42. Plaintiffs allege that the "regulatory fee structure" is "excessive" and constitutes a regulatory taking. *Id.* ¶¶ 43–44.

In August or September of 2024, plaintiffs "received a flurry of notices that code violations had been cleared following their settlement of the three Article 78 cases" against the City. Am. Compl. ¶ 49. But confusion abounds,

because the City "systematically fail[s]" to comply with its own rules, which require "that all code violations be sent by certified mail." *Id.* ¶¶ 50–52.

On February 17, 2023, the City's Corporation Counsel sent plaintiffs a letter stating that the City intended to take title to certain properties using a Tax Deed. *See* Am. Compl. ¶ 56. Although this letter stated the amount owed on all of the properties, plaintiffs allege that this letter made "no provisions for any administrative challenge to the purported taxes owed." *Id.* ¶ 57. According to plaintiffs, this letter threatened an "illegal seizure" because they were in "active litigation" over the "bogus fees that prevented their payment of their tax obligation." *Id.* ¶ 58.

Plaintiffs allege that other property owners in the City do not face "the same aggressive treatment" from defendants. *See* Am. Compl. ¶¶ 64–69. For instance, plaintiffs allege that no permits were pulled for the plumbing work done on a 330-unit property owned by another landowner. *Id.* ¶¶ 70–71. According to plaintiffs, "the logical conclusion to be drawn from this information" is that defendant "are simply not applying the same bogus requirements" to other landowners. *Id.* ¶ 72.

Plaintiffs' amended complaint identifies five of their properties that, in their view, have been subjected to defendants' "bogus code enforcement violations and other harassing and targeted behavior." Am. Compl. ¶¶ 83–85. For instance, at 24 Wood Street, defendants initially took legal action against

- 4 -

plaintiffs after a tree limb fell on a neighbor's property. *Id*. ¶¶ 86–97. Defendants later "revoked" the complaint but then declared plaintiff's tree unhealthy and instructed them to remove it. *Id*. ¶¶ 98–100. Plaintiffs hired an arborist, who opined the tree was healthy. *Id*. ¶¶ 101–02. Defendants eventually agreed, but this whole situation caused plaintiffs' insurance premiums to increase. *Id*.¶¶ 103–04. According to plaintiffs, this behavior was in retaliation for plaintiffs' pursuit of the state-court Article 78 petitions. *Id*. ¶¶ 108–10, 117–18. Plaintiffs further allege that Officer Hicks has made multiple "uninvited, unannounced" visits to the property and assessed additional code violations. *Id*. ¶¶ 111–16. According to plaintiffs, defendants assessed 25 code violations against this property from May 2019 through July 2024. *Id*. ¶ 87.

Plaintiffs allege similar patterns of misconduct with respect to properties at 53 Parker Street (November 2015 through October 2019), Am. Compl. ¶¶ 120–175, at 15 Jefferson Street (December 2014 through January 2022), *id*. ¶¶ 176–218, at 25 Thorton Avenue (plumbing certification), *id*. ¶¶ 219–248, and at 10 Janet Street (September 2015 through February 2023), *id*. ¶¶ 249–263.

Plaintiffs allege that defendants have "targeted" them for "enforcement of alleged regulations" about plumbing work in the City. Am. Compl. ¶¶ 264–276. According to plaintiffs, defendants have imposed a so-called "master plumber" requirement against plaintiffs but not other landowners. *See id*.

In addition, plaintiffs allege that defendants have contacted plaintiffs' financial lender about unpaid taxes after plaintiffs refused to pay the "bogus" fees assessed by defendants. Am. Compl. ¶¶ 277–322. According to plaintiffs, this dispute led their financial lender to accelerate the outstanding loans, which forced plaintiffs to incur additional fees to switch lenders and pay a higher interest rate. *See id.* Defendants sent similar delinquency notices to plaintiffs' tenants, harming their relationship. *Id.* ¶¶ 323–33. Defendants have also failed to properly respond to nine of plaintiffs' state-law freedom-of-information requests. *Id.* ¶¶ 334–46.

## III.  **LEGAL STANDARD**

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff,

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV.    DISCUSSION

Plaintiffs' eight-count amended complaint asserts 42 U.S.C. § 1983 claims for First Amendment retaliation (Count One), a Fifth Amendment Taking (Count Two), and violations of the Fourteenth Amendment's Equal Protection Clause (Count Three) and Due Process Clause (Count Four). Am. Compl. ¶¶ 347–408. Plaintiffs further allege state-law claims for tortious interference with business relations (Counts Five and Six), negligence (Count Seven), and a prima facie tort (Count Eight). *Id.* ¶¶ 409–64. Plaintiffs seek compensatory damages and at least $50 million in punitive damages. *Id.* ¶ 464.

### A.  Threshold Matters

Before reaching the merits, there are a few threshold matters to discuss: (1) the viability of the City as a § 1983 defendant; (2) whether Officer Hicks is necessarily entitled to qualified immunity at the pre-answer stage; and, relatedly, (3) whether plaintiffs have asserted any "official-capacity" claims against Officer Hicks or the Does.

### 1. Municipal Liability

First off, defendants contend that plaintiffs have failed to plausibly allege any of their § 1983 claims against the City because they have not identified "a single City policy, custom, and/or practice that led to the alleged violations." Dkt. No. 22-1 at 16. Further, defendants contend that any claim based on an alleged failure to train or supervise fails for various related reasons, including because it "fails to plead a pattern of conduct by the City or its agents that would allow . . . [the inference] that there was a failure to train or supervise" at the pleading stage. *Id*. at 20–21.

Plaintiffs respond that their amended complaint has articulated four bases for municipal liability: (1) the City "formally adopted, endorsed, and continues to endorse a policy that calls for the doubling of fines every thirty days for bogus code violations" despite a state-court settlement; (2) the City's policy-making officials, including Officer Hicks, engaged in conduct that deprived plaintiffs of their civil rights; (3) the amended complaint alleges "widespread and consistent" misconduct by subordinate officials that was expressly or impliedly authorized by policy-makers; and (4) the City has failed to train or supervise its employees. Dkt. No. 25-2 at 15–17.

Section 1983 "creates a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994). But unlike state law, § 1983 does not permit liability

based on a theory of *respondeat superior*, *i.e.*, a government entity cannot be held liable under § 1983 just because it employed the alleged tortfeasor.

Instead, pursuant to the Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), a local government can only be held responsible for its "*own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Thus, under *Monell* and its progeny, "the agent's actions must implement rather than frustrate the government's policy." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to actually have the force of law." *Connick*, 563 U.S. at 60. This "official policy" requirement "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986).

As the Second Circuit has explained, "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "The policy or custom need not be memorialized in a specific rule or regulation," *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), and may be "reflected in either action or inaction," *Cash v. County of Erie*, 654 F.3d 324, 341–42 (2d Cir. 2011).

Measured against this general legal standard, plaintiffs can maintain their § 1983 claims directly against the City under this body of law. In municipal liability cases under § 1983, "the question [is] whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

As discussed in more detail *infra*, plaintiffs have plausibly alleged one or more § 1983 claims based on the City's alleged enforcement of a particular fee or code enforcement structure—whether this structure is or was ever memorialized in writing or not (or perhaps deviated from the written rules when being enforced against plaintiffs)—that targeted them and that might have violated one or more state-court settlements.

Plaintiffs have also plausibly alleged that the enforcement of that fee structure (whatever its precise nature) by City officials, including by Officer Hicks, has caused them to suffer harm. At the pre-answer stage, the Court declines to wade any further into the considerably more granular question of which of plaintiffs' four theories of relief (if any of them) might best support plaintiffs' alleged *Monell* claim based on this fee structure.

Notably, regardless of whether or not Officer Hicks qualifies as a policy-maker on this subject for purposes of *Monell* (though his alleged job title suggests that, at the minimum, this is a fact question better suited for resolution after some discovery), plaintiffs can pursue their § 1983 claims—insofar as

they are grounded in the enforcement of the allegedly unconstitutional fee structure being challenged—against the City itself.  *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("In fact, the plaintiff need not sue the individual tortfeasors at all, but may proceed solely against the municipality."); *see also Owen v. City of Independence*, 445 U.S. 622 (1980) (holding that municipalities are not entitled to qualified immunity).

### 2. Qualified Immunity

Second, defendants contend that Officer Hicks is entitled to qualified immunity from plaintiffs' § 1983 claims.  Dkt. No. 22-1 at 29–31.  According to defendants, Officer Hicks's conduct was at all times consistent with the City's established building code and therefore he lacked any notice that issuing violations and fines against plaintiffs based on that code would have violated their constitutional rights.  *Id.* at 31.  Plaintiffs respond that Officer Hicks did not simply issue code violations but intentionally targeted them for enforcement of a bogus fee structure despite knowing that it was unconstitutional, in part due to his senior management position in the City.   Dkt. No. 25-2 at 28–29.

"Section 1983 creates a cause of action based on personal liability and predicated upon fault."  *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1230 (1997).  Although the state-of-mind requirement might vary, *Daniels v. Williams*, 474 U.S. 327, 330 (1986), a § 1983 claim holds an individual personally liable for the role his or her acts or

omissions played in violating someone's constitutional rights, *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023).

Related to § 1983's "personal involvement" requirement is the affirmative defense of qualified immunity, which shields individual defendants from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Linton v. Zorn*, 135 F.4th 19, 31 (2d Cir. 2025).

Under the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), to defeat qualified immunity a plaintiff show that (1) the official violated a statutory or constitutional right; (2) that was "clearly established" at the time of the challenged conduct. *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019).

To be clearly established, the rule must be "settled law," which means it is dictated by a "controlling authority" or a "robust consensus of cases of persuasive authority" *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018), that is "particularized" to the facts of the case, *White v. Pauly*, 580 U.S. 73, 79 (2017).

For reasons discussed in more detail *infra* with respect to plaintiffs' individual § 1983 claims, plaintiffs have plausibly alleged that Officer Hicks intentionally targeted plaintiffs for enforcement of a fee or fine structure that he knew to be "unconstitutional," evidenced in part by the fact that he was aware that the City had agreed to amend the fee structure due to apparent constitutional infirmities. *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (cleaned up) ("A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

To be sure, defendants contend that Officer Hicks was merely enforcing the City's written code in a good-faith effort to discharge his duties as code enforcement officer. Discovery may bear that out. But plaintiffs have plausibly alleged that Officer Hicks was not acting in good faith. For instance, plaintiffs have alleged that he singled out plaintiffs and knowingly enforced a fee or fine structure against them in retaliation for their protected activity despite being aware that the fee structure was unlawful or unconstitutional.

It is unclear, based on the pleading, whether this so-called "bogus" fee structure matched the written building code or whether it departed in one or more respects. Either way, plaintiffs have alleged that Officer Hicks was "personally involved" in at least some degree of conduct that, if proven, would have violated one or more of their "clearly established" constitutional rights. *See*

- 13 -

Dkt. No.25-2 at 29 (collecting cases on clearly established nature of plaintiffs'
First, Fifth, and Fourteenth Amendment claims).

### 3. Official-Capacity

Third, the Court *sua sponte* raises the question of why Officer Hicks or
any of the Does were named in the caption in their "official capacities."

A § 1983 "official-capacity" claim against a municipal official "is treated
as an action against the municipality itself." *Coon v. Town of Springfield*, 404
F.3d 683, 687 (2d Cir. 2005). Where, as here, the plaintiff has also named the
municipality as a defendant, courts generally dismiss official-capacity claims
as redundant or duplicative. *See, e.g.*, *Hulett v. City of Syracuse*, 253 F. Supp.
3d 462, 498–99 (N.D.N.Y. 2017).

Measured against this body of law, any § 1983 claims that plaintiffs have
asserted against Officer Hicks or others in their "official capacity" would be
redundant of their § 1983 claims against the City. Under very limited circum-
stances, a plaintiff can pursue an "official-capacity" claim against a public offi-
cial using a doctrine called *Ex parte Young*, which evades the Eleventh Amend-
ment's immunity bar. *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 333
(E.D.N.Y. 2014).

But resort to this doctrine is unnecessary where, as here, (1) the defend-
ant-municipality is not entitled to Eleventh Amendment immunity in the first
place; and/or (2) plaintiffs' *ad damnum* clause seeks money damages rather

- 14 -

than any prospective injunctive relief.[1]  Accordingly, any "official-capacity" claims must be dismissed.

### B.  Federal-Law Claims

Plaintiff asserts § 1983 claims for First Amendment retaliation (Count One), a Fifth Amendment Taking (Count Two), and violations of the Fourteenth Amendment's Equal Protection Clause (Count Three) and Due Process Clause (Count Four).  Am. Compl. ¶¶ 347–408.

### 1.  First Amendment Retaliation

Defendants argue that plaintiffs have failed to plausibly allege a First Amendment retaliation claim.  Dkt. No. 22-1 at 21–23.  According to defendants, the alleged retaliation (the application of the fines or fees) occurred before the alleged protected activity (the filing of the state-court Article 78 petitions), and therefore plaintiffs cannot show causation as a matter of law.  *See id.*

Plaintiffs respond that defendants targeted plaintiffs before, during, and after they filed their state-court Article 78 petitions.  Dkt. No. 25-2 at 20.  According to plaintiffs, defendants took adverse actions against them on dates and at times when plaintiffs "were actively engaged with ongoing and/or contemplated litigation."  *Id.* (citing Am. Compl. ¶¶ 88–98, 220–32, 323–33).

---

[1]  Plaintiffs' sur-reply suggests that defendants have recently repealed or amended municipal law to attempt to "moot" their claims.  Dkt. No. 33.  But the justiciability doctrines identified by plaintiffs apply to claims for prospective equitable relief, not to claims seeking money damages for completed harms.  Plaintiffs' operative pleading only asserts claims for the latter.  *See* Dkt. No. 17.

"To state a First Amendment claim, a plaintiff must allege facts admitting a plausible inference that the defendant's actions restricted, or were retaliation against, speech or conduct protected by the First Amendment." *Salmon v. Blesser*, 802 F.3d 249, 255 (2d Cir. 2015) (collecting cases).

Measured against this general legal standard, plaintiffs have plausibly alleged that defendants retaliated against them for engaging in protected activity, which as relevant here includes plaintiffs' pursuit of state-court litigation against the City based on the "bogus" fee structure imposed against them at their properties. *See* Dkt. No. 25-2 at 18–20.

First, plaintiffs are clearly correct that the pursuit of litigation against a municipality is protected activity. *See, e.g.*, *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025) ("[T]he filing of a lawsuit . . . is protected conduct."); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) ("The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment."); *Ruggiero v. City of Cortland, N.Y.*, 2019 WL 1978623, at \*6 (N.D.N.Y. May 3, 2019) (finding pro se plaintiff-landlord had plausibly alleged First Amendment retaliation claim against municipal defendants who treated his properties less favorably after he pursued a lawsuit against a zoning ordinance).

Second, plaintiffs are correct that a "chill" is not always required in the First Amendment context. *See, e.g.*, *Mangino v. Inc. Vill. of Patchogue*, 808

F.3d 951, 956 (2d Cir. 2015); *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). In the absence of a chill, a plaintiff can pursue a First Amendment claim based on a variety of different "concrete harms." *See, e.g.*, Dkt. No. 25-2 at 19 (collecting cases); *see also Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (cautioning the lower courts that First Amendment claims are heavily dependent upon the factual context alleged in the pleading).

Third, temporal proximity can be sufficient to raise an inference of causation, especially at the pre-answer stage. *See, e.g.*, *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."). Plaintiffs' amended complaint plausibly alleges causation because at least some of defendants' alleged retaliatory conduct (for which, taken as true based on the pleading, plaintiffs were singled out compared to other landowners) occurred during and/or after one or more of the three rounds of state-court litigation that took place between the parties. *See, e.g.*, *Agnew v. D'Amore*, 2025 WL 1455526, at *9 (N.D.N.Y. May 11, 2025) ("Recognizing the difficult inherent in establishing adverse parties' motives before discovery, the Second Circuit has held that, for the purposes of a complaint, it is sufficient to allege facts from which a retaliatory intent may reasonably be inferred.").

In sum, plaintiffs have plausibly alleged a First Amendment retaliation claim. Accordingly, defendants' motion to dismiss this claim will be denied.

### 2. Fifth Amendment Taking

Defendants argue that plaintiffs have failed to plausibly allege a Fifth Amendment regulatory taking.  Dkt. No. 22-1 at 24–25.  According to defendants, the City's alleged interference with plaintiffs' mortgage lender would not establish a regulatory taking.  *See id.*  Further, defendants contend that plaintiffs failed to plausibly allege a "regulation or regulatory act" that resulted in the loss of value to a property or properties.  *Id.*

Plaintiffs respond that they suffered actionable "non-categorical" regulatory takings when the City imposed regulatory roadblocks and undue procedural costs that prevented Petro from making use of certain rental properties over an extended period of time.  Dkt. No. 25-2 at 21–26.

The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  This restriction has been incorporated against the States through the Due Process Clause of the Fourteenth Amendment.  *Chicago B. & Q. R.R. v. City of Chicago*, 166 U.S. 226 (1897).

"The law recognizes two species of takings: physical takings and regulatory takings."  *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (collecting cases).  A physical taking "is a direct government appropriation or physical invasion of private property."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S.

528, 537 (2005).  A regulatory taking occurs "when the government acts in a regulatory capacity."  *Buffalo Teachers Fed'n*, 464 F.3d at 374.

A regulatory taking may be either "categorical" or "non-categorical."  *See, e.g.*, *Lewis v. City of N.Y.*, 762 F. Supp. 3d 290, 304 (S.D.N.Y. 2025).  A categorical regulatory taking only occurs in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (cleaned up).  A non-categorical taking is "[a]nything less than a complete elimination of value, or a total loss."  *Id.* at 331 (cleaned up).

Plaintiffs have alleged a non-categorical taking, which is governed by the Supreme Court's decision in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  As the Second Circuit has explained, these regulatory takings require "an intensive *ad hoc* inquiry into the circumstances of each particular case."  *Buffalo Teachers Fed'n*, 464 F.3d at 375.

Courts "weigh three factors to determine whether the interference with property rises to the level of a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  *Buffalo Teachers Fed'n*, 464 F.3d at 375 (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25 (1986)).

Measured against this general legal standard, plaintiffs have plausibly alleged that defendants' conduct amounted to a non-categorical regulatory taking. *See* Dkt. No. 25-2 at 24 (identifying salient factual allegations). Plaintiffs have alleged that defendants singled them out and, in a bad-faith application of its policy or code, exercised regulatory authority to impose a series of escalating procedural costs that continued unabated—even after state-court litigation. Further, plaintiffs have plausibly alleged that defendants' alleged misconduct was intended to deprive plaintiffs of the beneficial use of their properties for a fairly extended period of time. *Cf. Sherman v. Town of Chester*, 752 F.3d 554, 565–66 (2d Cir. 2014) (finding non-categorical takings claim plausibly alleged where defendant-municipality allegedly "singled out [plaintiff's] development, suffocating him with red tape to make sure he could never succeed in developing [his property]."). Accordingly, plaintiffs have plausibly alleged this claim.

### 3. Equal Protection

Defendants argue that plaintiffs have failed to plausibly allege an Equal Protection claim. Dkt. No. 22-1 at 26–28. According to defendants, plaintiffs' list of "comparators" fails to provide the kind of factual detail that might permit an inference that these properties are materially similar. *Id*.

Plaintiffs respond that they have adequately pleaded a class-of-one or selective enforcement theory. Dkt. No. 25-2 at 26. According to plaintiffs, they

have sufficiently alleged that: (1) defendants intentionally and discriminatorily enforced unconstitutional regulations against them in a manner not applied to similarly situated property owners in retaliation for the exercise of their First Amendment rights; and/or (2) selectively notified plaintiffs' lenders and tenants about their tax status with intent to harm plaintiffs' reputation and business. *Id.* at 26–28.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This Constitution provision is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

"There are a number of common methods for pleading an equal protection claim." *Kisembo v. N.Y. State Office of Children & Fam. Servs.*, 285 F. Supp. 3d 509, 523 (N.D.N.Y. 2018). First, "[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race.'" *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013) (quoting *Brown v. City of Oneida*, 221 F.3d 329, 337 (2d Cir. 1999)). Second, "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *Brown*, 221 F.3d at 337 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)). Third, "[a] plaintiff could also allege that a facially

neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Floyd*, 959 F. Supp. 2d at 570 (citation omitted).

With respect to these first three theories, a plaintiff "generally need not plead or show the disparate treatment of similarly situated individual." *Pyke v. Cuomo*, 258 F.3d 107, 108–09 (2d Cir. 2001). Plaintiffs have not alleged that they are members of any inherently suspect or vulnerable class and therefore these first three theories of relief are inapplicable to their § 1983 claims.

However, there are two other ways to plead an equal protection violation. Pursuant to *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), a plaintiff may assert a "selective enforcement" claim by showing they were treated differently "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injury a person." *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013).

Alternatively, pursuant to *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), a plaintiff may assert a "class of one" claim by alleging that "they were intentionally treated different from others similarly situated and that there was no rational basis for this difference in treatment." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 558 (S.D.N.Y. 2006).

Measured against this general body of law, plaintiffs have plausibly alleged a claim under *LeClair* and/or *Olech*. To be sure, "the Equal Protection

Clause does not require perfectly uniform enforcement efforts." *Gray v. Town of Easton*, 115 F. Supp. 3d 312, 320 (D. Conn. 2015), *aff'd sub nom. Gray v. Maquat*, 669 F. App'x 4 (2d Cir. 2016) (summary order).

However, plaintiffs have plausibly alleged that defendants intentionally enforced the "bogus" fee structure against them in retaliation for exercising their rights, including their right to pursue state-court litigation. Plaintiffs have also plausibly alleged, at least at this stage of the case, that exceedingly similarly situated property owners who did not sue the City were treated more favorably. *See, e.g.*, *Hu v. City of N.Y.*, 927 F.3d 81, 93 (2d Cir. 2019) (explaining standards for these two "non-class-based Equal Protection" claims); *see also Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 372 (S.D.N.Y. 2011) ("Where, as here, an equal protection claim is based on an alleged First Amendment violation, the former 'coalesces with the latter.'").

### 4. Procedural Due Process

Defendants argue that plaintiffs have failed to plausibly allege a Procedural Due Process claim. Dkt. No. 22-1 at 28–29. According to defendants, the three Article 78 proceedings filed by plaintiffs are "fatal" to this claim because the existence and availability of this state-court remedy satisfies the requirements of due process as a matter of law. *Id.*

Plaintiffs respond that the mere existence of an Article 78 proceeding does not preclude a procedural due process claim where, as here, defendants'

alleged conduct was undertaken pursuant to a municipal policy rather than the result of random and unauthorized conduct. Dkt. No. 25-2 at 24–25. Further, plaintiffs claim that the Article 78 proceedings were inadequate because defendants continued to apply the bogus fee structure against them. *Id.* at 25–26.

The Fourteenth Amendment's Due Process Clause protects procedural and substantive rights. On one hand, "[p]rocedural due process requires that 'a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Ceja v. Vacca*, 503 F. App'x 20, 22 (2d Cir. 2012) (summary order) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)). On the other hand, "[s]ubstantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Kisembo v. N.Y. State Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 521 (N.D.N.Y. 2018) (citation omitted).

Plaintiffs have asserted a procedural due process claim. "To assert a violation of procedural due process rights, a plaintiff must first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." *Ferreira v. Town of E. Hampton*, 56 F. Supp. 3d 211, 225 (E.D.N.Y. 2014) (cleaned up). "Notice and an opportunity to be heard are the hallmarks of due process." *Id.*

Measured against this general body of law, plaintiffs have failed to plausibly allege a procedural due process violation. "In evaluating what process satisfies the Due Process Clause, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Rivera-Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (cleaned up).

"When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Rivera-Powell*, 470 F.3d at 465. "In contrast, when the deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing." *Id.* In the latter scenario, "the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process." *Id.* (cleaned up).

Plaintiffs acknowledge the general availability of a state-court procedural remedy, *i.e.*, an Article 78 proceeding. Even so, plaintiffs claim that this remedy is "inadequate," evidenced in part by the fact that plaintiffs have repeatedly pursued relief against defendants' alleged misconduct without complete success. *See* Dkt. No. 25-2 at 24–26.

That argument has some force, at least assuming that plaintiffs' framing of the state-court litigation is accurate. But the strong trend in federal practice is to resist the urge to constitutionalize procedural challenges to zoning- or

code-related municipal decision-making.  *See, e.g.*, *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) ("[T]he Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions; in our federal system, that is the province of the state courts.").

Consistent with that general principle, federal courts sitting in this state have repeatedly held that an Article 78 proceeding satisfies due process in the land-use context.  *Cf. Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 428–29 (E.D.N.Y. 2021) (collecting cases).  In reaching this conclusion, the Court recognizes that plaintiffs' theory of the case is that defendants were engaged in systematic misconduct as opposed to random or unauthorized action, and that prior Article 78 proceedings failed to put a stop to it.  Importantly, however, plaintiffs do concede that they received *some* relief from one or more of these state-court proceedings.  *See, e.g.*, Am. Compl. ¶ 49.

To be sure, plaintiffs have alleged other conduct related to these issues that, if proven, would establish other kinds of constitutional claims (*e.g.*, singling out a party for mistreatment in retaliation for protected activity). However, under these circumstances, the Court concludes that plaintiffs have failed to plausibly allege that Article 78 was an inadequate remedy for purposes of

procedural due process.[2]  *Cf. Hudson Shore Assocs. Ltd. P'Ship v. New York,* 139 F.4th 299, 114 (2d Cir. 2025) (reiterating general principle that Article 78's availability will preclude procedural due process claim).

### C.  State-Law Claims

Plaintiffs allege state-law claims for tortious interference with business relations (Counts Five and Six), negligence (Count Seven), and a prima facie tort (Count Eight).  Am. Compl. ¶¶ 409–64.

As an initial matter, the Court rejects defendants' argument that plaintiffs' only state-law recourse (or perhaps a condition precedent to this suit) was another Article 78 challenge.  *See* Dkt. No. 22-1 at 32.  Likewise, for substantially the reasons set forth in plaintiffs' opposition, the Court rejects defendants' argument that the General Municipal Law's Notice of Claim requirement bars plaintiffs' state-law claims.  *See* Dkt. No. 25-2 at 30–32.

Finally, the Court rejects (for now) defendants' argument—developed only in a footnote with respect to "the passage of code violation fee schedules"—that state-law immunity would attach to these claims.  *See* Dkt. No. 22-1 at 34 n.15.  It is equally unclear at this time whether the immunity principles

---

[2] In their sur-reply, plaintiffs appear to suggest that perhaps the City was obligated to provide them some form of "pre-deprivation" process before each doubling of the fees in question.  Dkt. No. 33 at 4. While that alleged behavior might support some other kind of claim, the Court was unable to find any black letter law to support the notion plaintiffs enjoyed a property interest in the City's enforcement of the "bogus" code that would be sufficient to trigger a pre-deprivation hearing, let alone pre-deprivation notice and a hearing before every "doubling" or "compounding" of the fees.

identified by defendants would attach to all of the conduct alleged by plaintiffs, including but not limited to the allegedly malicious decision by City officials to make allegedly false statements to third parties about plaintiffs' tax status.

In short, because this argument was only developed in a footnote, the Court concludes it can be given short shrift for now. *Cf. Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").

### 1.  Tortious Interference

Defendants argue that plaintiffs have failed to plausibly allege that defendants tortiously interfered with any of plaintiffs' existing and/or potential business relationships  Dkt. No. 22-1 at 34–38.

To state a claim for tortious interference with business relations under New York law, a plaintiff must plausibly allege: (1) business relations with a third party; (2) with which the defendant interfered; (3) for a wrongful purpose or using dishonest, unfair, or improper means; that (4) injured plaintiffs' relationship with the third party. *Catskill Dev., L.L.C. v. Park Place Ent. Grp.*, 547 F.3d 115, 132 (2d Cir. 2008) (collecting cases).

Measured against this general legal standard, plaintiff has plausibly alleged that defendants engaged in malicious conduct with the goal of

intentionally inflicting harm on plaintiffs that included, as relevant to this claim, allegedly falsely informing plaintiffs' lender about certain tax delinquencies. *See* Dkt. No. 25-2 at 32–35.

### 2. Negligence

Upon review, this claim must be dismissed. Plaintiffs contend that Officer Hicks (and others) targeted plaintiffs for "purely personal" reasons. Dkt. No. 25-2 at 36. But that is not consistent with the rest of plaintiffs' theory of the case, which alleges that Officer Hicks was implementing rather than frustrating City policy. Although it is permissible to plead legal theories in the alternative, *see, e.g.*, FED. R. CIV. P. 8(d), this principle generally precludes a party from pleading alternative *facts*. *See, e.g.*, *United States v. Gotti*, 771 F. Supp. 535, 540 (E.D.N.Y. 1991).

In short, the Court has reviewed the applicable law and, given that all of the alleged conduct involved the enforcement of the City's building codes (even if "bogus" or "unconstitutional"), plaintiffs have not plausibly alleged that defendants were acting outside the scope of employment. *See, e.g.*, *Flannery v. County of Niagara*, 763 F. Supp. 3d 364, 451 (W.D.N.Y. 2025) (collecting cases).

### 3. Prima Facie Tort

This claim must also be dismissed. The "touchstone" of a prima facie tort is "disinterested malevolence, meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to

harm." *Arnold v. Town of Camillus, New York*, 662 F. Supp. 3d 245, 272 (N.D.N.Y. 2023) (cleaned up). "Prima facie tort was designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy, and not to provide a catch all alternative for every cause of action which cannot stand on its legs." *Id.*

Measured against this general body of law, the Court concludes that the allegations in plaintiffs' amended complaint are ill-suited for this disfavored tort. Here, plaintiffs allege that municipal officials engaged in conduct that singled out plaintiffs for mistreatment under a "bogus" fee structure. This conduct, if true, would almost certainly be unlawful. This conduct, if true, would also be actionable under the other theories discussed *supra*. Accordingly, this claim will be dismissed. *Cf. Watkins v. Town of Webster*, 592 F. Supp. 3d 96, 130 (W.D.N.Y. 2022).

### D. Punitive Damages

Finally, defendants argue that punitive damages are unavailable against the City. Dkt. Nol. 22-1 at 31–32. Plaintiffs appear to concede this is true as to the City but maintain that punitive damages might be available against Officer Hicks (or perhaps one or more Does) in their "individual capacities" for conduct in which he or they were "personally involved." Dkt. No. 25-2 at 37. Upon review, the Court agrees with the parties that punitive damages are unavailable against the City but might be available against Officer Hicks

or perhaps one or more Does. *See, e.g.*, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

## IV.   CONCLUSION

Plaintiffs' § 1983 procedural due process claim (Count Four) will be dismissed. Plaintiffs' state-law claims for negligence (Count Seven) and prima facie tort (Count Eight) must also be dismissed. However, plaintiffs' remaining claims are plausibly alleged and must proceed to discovery.

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss (Dkt. No. 22) is GRANTED in part and DENIED in part;

2.  Plaintiffs' § 1983 procedural due process claim (Count Four) is DISMISSED;

3.  Plaintiffs' state-law claims for negligence (Count Seven) and prima facie tort (Count Eight) are DISMISSED;

4.  Plaintiffs' § 1983 claims for First Amendment retaliation (Count One), a Fifth Amendment Taking (Count Two), and a violation of the Fourteenth Amendment's Equal Protection Clause (Count Three) REMAIN for discovery;

5.  Plaintiffs' state-law claims for tortious interference with business relations (Counts Five and Six) REMAIN for discovery; and

6. Defendants shall answer the amended complaint within FOURTEEN DAYS of the date of this opinion.

The Clerk of the Court is directed to terminate the pending motion and set an answer deadline accordingly.

IT IS SO ORDERED.

Dated:  March 13, 2026
   Utica, New York.

David N. Hurd
U.S. District Judge